In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3392

GABRIELA CORDOVA-SOTO,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR.,
Attorney General of the United States,

*Respondent.*

Petition for Review of an Order of
the Board of Immigration Appeals.
A091-045-891.

ARGUED JULY 10, 2013 — DECIDED OCTOBER 15, 2013

Before BAUER, TINDER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Petitioner Gabriela Cordova-Soto is a Mexican citizen whose parents brought her to the United States at the age of nine months. She eventually became a lawful permanent resident. In 2005 at age 27, however, she signed a written stipulation agreeing to removal to Mexico after she was convicted in state court for possession of methamphetamine. She believed, she says, based on legal

advice from an immigration officer that she had no way to stay in the United States lawfully after that conviction.

Immediately after her removal, though, Cordova-Soto returned to the United States unlawfully. After she was discovered in 2010, her earlier removal order from 2005 was reinstated. See 8 U.S.C. § 1231(a)(5). She was again removed to Mexico. After that second removal, Cordova-Soto sought in 2011 to reopen the removal order entered back in 2005. An immigration judge and then the Board of Immigration Appeals denied her motion to reopen the 2005 removal order. Cordova-Soto has petitioned for judicial review. We conclude that her illegal reentry after her 2005 removal permanently bars reopening that earlier removal order. See 8 U.S.C. § 1231(a)(5). Accordingly, we deny her petition.

I.  *Factual and Procedural Background*

Cordova-Soto entered the United States in 1978 as an infant and became a lawful permanent resident in 1991 at the age of 13. After moving to Kansas, she worked at fast food restaurants to support her family and eventually received her high school equivalency degree. In her late teens, she started using drugs and ran into trouble with the law. She was sentenced to six months in prison in 2002 for theft, served 60 days in prison in 2003 for passing a worthless check, and was given a 20-month suspended sentence in 2005 for possessing methamphetamine—a felony under state law. See Kan. Stat. § 65-4160 (2005).

As a result of those convictions, immigration authorities in 2005 acted to remove Cordova-Soto on three related but legally distinct grounds: (1) commission of an aggravated felony;

(2) commission of two crimes involving moral turpitude; and (3) commission of a controlled substance offense. See 8 U.S.C. § 1227(a)(2)(A)(ii), (a)(2)(A)(iii), and (a)(2)(B)(i). At the time of these immigration charges, the circuit courts of appeals had split on whether a drug possession conviction like Cordova-Soto's that was a felony under state law but that would be a misdemeanor under federal law should be treated as an aggravated felony for purposes of federal immigration law. See 8 U.S.C. § 1101(a)(43); *Lopez v. Gonzales*, 549 U.S. 47, 52 & n.3 (2006) (resolving circuit split and holding that such convictions were not aggravated felonies under immigration law). We ruled in early 2006 that state convictions for drug possession without intent to distribute were not aggravated felonies for immigration purposes. *Gonzales-Gomez v. Achim*, 441 F.3d 532, 535 (7th Cir. 2006).

According to Cordova-Soto, though, during her removal proceedings in 2005 an immigration officer said that she "did not have any way to stay in the United States," and she received similar advice from a legal aid organization. Believing that her case was hopeless, she signed a "Stipulated Request for Issuance of Final Order of Removal, [and] Waiver of Appearance and Hearing." This form included an admission of the factual allegations in her Notice to Appear, a waiver of "any right to make application for any relief from removal including … cancellation of removal," and an acknowledgment that she signed the form "voluntarily, knowingly, and intelligently."

Based on the stipulation, and without a hearing, an immigration judge ordered Cordova-Soto removed to Mexico in November 2005. According to the National Immigrant Law

Center, which filed an amicus curiae brief in this case, immigration officers routinely give detained immigrants like Cordova-Soto misleading information about their legal rights when offering them stipulated orders of removal. We do not know this is so, but we will assume it is for purposes of this case.

Just three weeks after her removal, Cordova-Soto returned to the United States illegally and moved back to Kansas to live with her four U.S.-born children (then ages 9, 8, 8, and 1) and their U.S.-citizen father, whom she later married in 2009. As understandable as her illegal return may have been in human terms, her illegal return has decisive consequences in this case.

In 2010 immigration authorities discovered that Cordova-Soto had returned to the United States and took her into custody. The authorities reinstated the 2005 order of removal using an expedited process available for aliens who are removed and then return illegally. See 8 U.S.C. § 1231(a)(5).

Cordova-Soto was again removed to Mexico. From there, she appealed to the Board of Immigration Appeals, which dismissed her appeal. She then petitioned the Tenth Circuit to review the reinstatement of the 2005 order of removal and the underlying order of removal itself. The Tenth Circuit ruled that it lacked jurisdiction to review the 2005 order and rejected Cordova-Soto's argument attacking the reinstatement of that order. *Cordova-Soto v. Holder*, 659 F.3d 1029, 1035 (10th Cir. 2011).

After the Tenth Circuit rejected her challenge to the reinstatement, Cordova-Soto filed a motion with an immigration judge to reopen her 2005 removal order. She

argued that the standard 90-day deadline did not apply or was equitably tolled. She also asked that the order be reopened *sua sponte* because of the defects in the underlying order. (A request for *sua sponte* reopening is an oxymoron, but the odd concept seems to be well entrenched in immigration law.)

The immigration judge denied Cordova-Soto's motion on four grounds: (1) her motion was untimely, and she had not shown due diligence by "hiding out for five years" and not consulting a lawyer until she was detained; (2) a removal order could never be reopened after the alien's illegal reentry and reinstatement of the order, see 8 U.S.C. § 1231(a)(5); (3) her written stipulation was knowing and intelligent because, the immigration judge asserted, the legal advice she received was correct at that time; and (4) she had not shown exceptional circumstances that would justify reopening *sua sponte*.

The Board agreed with the immigration judge that the motion was untimely and added that there was no basis for equitable tolling without a claim of ineffective assistance of counsel or other reason to think she was unaware of the status of her case. The Board also agreed with the immigration judge that Cordova-Soto had not presented "exceptional circumstances" that warranted reopening *sua sponte*. Cordova-Soto now petitions for review of that denial of reopening of the 2005 removal order.

## II. *Venue*

We begin our analysis with the threshold question of venue. The government has moved to have this case dismissed for improper venue or transferred to the Eighth Circuit. At the time of Cordova-Soto's 2005 removal order, removal

proceedings like hers that began in Kansas (her state of residence) were adjudicated by the immigration court in Chicago. Three years later the immigration court in Kansas City, Missouri, assumed control over proceedings involving aliens residing in Missouri and Kansas. Cordova-Soto filed her 2011 motion to reopen in Chicago, but was told to re-file in Kansas City. She did so, and an immigration judge in Kansas City denied her motion to reopen.

A petition for review must be "filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings." 8 U.S.C. § 1252(b)(2). This is not a jurisdictional statute, however, so we are not deprived of subject matter jurisdiction over the petition merely because Cordova-Soto's immigration proceedings were completed in the Eighth Circuit. See *Thiam v. Holder*, 677 F.3d 299, 301–02 (6th Cir. 2012) (listing cases); see also *Nwaokolo v. INS*, 314 F.3d 303, 306 n.2 (7th Cir. 2002) (per curiam). When jurisdiction is absent, 28 U.S.C. § 1631 empowers us to transfer a case to a court with jurisdiction "if it is in the interest of justice." We join other circuits that take guidance from § 1631 in assessing whether to transfer a case from one court, like ours, having jurisdiction to another that would also have proper venue. See *Thiam*, 677 F.3d at 302; *Sorcia v. Holder*, 643 F.3d 117, 122 (4th Cir. 2011); *Moreno-Bravo v. Gonzales*, 463 F.3d 253, 262–63 (2d Cir. 2006).

Based on a combination of several unusual features of this case, we conclude that the interest of justice favors keeping Cordova-Soto's petition in this court. First, although the government moved to transfer soon after the petition was filed, the case has now been briefed and argued. A transfer now

would inconvenience both parties, occupy two courts, and delay resolution of the petition. See *Moreno-Bravo*, 463 F.3d at 262–63; *Bonhometre v. Gonzales*, 414 F.3d 442, 446 n.5 (3d Cir. 2005). Second, Cordova-Soto is represented by pro bono counsel located in Chicago, so transfer would impose increased costs and inconvenience on her attorneys, whereas the government litigates nationwide. See *Thiam*, 677 F.3d at 302; *Sorcia*, 643 F.3d at 122–24. Also, because this case originally started in Chicago, Cordova-Soto did not act unreasonably by filing her petition here. In light of this unusual history, we believe the better course is to exercise our discretion to keep the petition in this court.

## III.   *Jurisdiction*

The government also challenges our jurisdiction to review the denial of Cordova-Soto's motion to reopen the 2005 removal order. The government asserts that we may not decide the case because Cordova-Soto did not timely appeal the earlier removal order. Alternatively, the government argues that the Board lacks jurisdiction to reopen a removal order at any point after it has been reinstated. It points to a provision in the Immigration and Nationality Act governing reinstated removal orders: "If the Attorney General finds that an alien has reentered the United States illegally after having been removed … the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed." 8 U.S.C. § 1231(a)(5).

This court does not have jurisdiction to review the 2005 removal order itself. The government is correct that the time to appeal the 2005 removal order expired thirty days after its

entry. See 8 U.S.C. § 1252(b)(1). This court does have jurisdiction, however, to hear Cordova-Soto's challenge to the Board's denial of her motion to reopen because she timely raises questions of law about the meaning of § 1231(a)(5). See 8 U.S.C. § 1252(a)(2)(D); *Zambrano-Reyes v. Holder*, 725 F.3d 744, 751 (7th Cir. 2013); *Marinov v. Holder*, 687 F.3d 365, 368 (7th Cir. 2012); *Bachynskyy v. Holder*, 668 F.3d 412, 416–17 (7th Cir. 2011).

IV.    *The Merits of the Petition*

We turn to the merits of the denial of Cordova-Soto's motion to reopen. Because the Board agreed with the immigration judge's multiple grounds for denying the petition, we review the immigration judge's order as supplemented by the Board's decision. See *Munoz-Avila v. Holder*, 716 F.3d 976, 978 (7th Cir. 2013); *Abraham v. Holder*, 647 F.3d 626, 632 (7th Cir. 2011).

Although we have jurisdiction to consider the merits, we agree with the government that § 1231(a)(5) bars reopening of a removal order that has been reinstated after the alien's illegal return to the United States. That paragraph of the statute is entitled "Reinstatement of removal orders against aliens illegally reentering," and it provides:

> If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be

removed under the prior order at any time after
the reentry.

Cordova-Soto argues that § 1231(a)(5) is not a permanent
bar but instead prevents aliens from reopening their removal
orders only while the reinstatement process is underway. She
points out that the statute is written in the present tense, not
the future tense: the order "is reinstated" and "is not subject to
being reopened." 8 U.S.C. § 1231(a)(5). She adds that reading
the provision as a permanent bar raises due process concerns
because aliens who contend that they were removed without
notice and hearing would be forever unable to challenge their
removal orders after reinstatement. (This would be true,
however, only for aliens who are removed and who then
choose to reenter the United States illegally.) She also notes
that Congress explicitly used the word "permanently" in other
portions of the Immigration and Nationality Act when it
intended to forever bar any future relief. See, *e.g.*, 8 U.S.C.
§ 1158(d)(6).

We disagree with Cordova-Soto's reading of § 1231(a)(5)
and its purpose. First, the argument based on the text is not
persuasive. The Immigration and Naturalization Act contains
a number of provisions written in the present tense that
nonetheless operate permanently. In particular, the statute
permanently bars entry of certain aliens by using the phrase "is
inadmissible." Such aliens include those who have committed
application fraud, see 8 U.S.C. § 1182(a)(6)(C)(i) ("Any alien
who, by fraud or willfully misrepresenting a material fact,
seeks to procure … [a] benefit provided under this chapter is
inadmissible."); *Valenzuela-Solari v. Mukasey*, 551 F.3d 53, 56 (1st
Cir. 2008), and those who have illegally reentered the United

States after removal, see 8 U.S.C. § 1182(a)(9)(C)(i)(II) ("Any alien who has been ordered removed … and who enters or attempts to reenter the United States without being admitted is inadmissible."); *Lemus-Losa v. Holder*, 576 F.3d 752, 761 (7th Cir. 2009). When a bar is designed to be less than permanent, though, such as when an applicant must wait a certain number of years before seeking to reenter, the Act specifies how long the bar lasts. See 8 U.S.C. § 1182(a)(9)(A)(i).

Second, the purpose of § 1231(a)(5) is "to expedite the re-removal of a person who returns without permission after being removed." *Tapia-Lemos v. Holder*, 696 F.3d 687, 690 (7th Cir. 2012). Congress added the provision in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, 110 Stat. 3009, to invest the reinstatement process "with something closer to finality." *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 40 (2006) (upholding application of provision to alien who reentered United States illegally before provision was passed); *Zambrano-Reyes*, 725 F.3d at 752 (denying petition where alien had illegally reentered United States and sought judicial review of denial of his request to reopen original removal order); see also *Herrera-Molina v. Holder*, 597 F.3d 128, 133 (2d Cir. 2010). The text of the statute does not allow room for avoiding this clear purpose.

Third, an alien in Cordova-Soto's situation in 2005 had available to her extensive procedures to protect her rights and interests. Congress made a reasonable and understandable choice to provide that an alien who is removed pursuant to those procedures should not be able to engage in unlawful self-help by simply sneaking back into the country.

Cordova-Soto had a reasonable opportunity to move to reopen back in 2005. Instead, she returned to the United States just three weeks after she was removed. Given her desire to return, she could have consulted an attorney to determine if she had been mistakenly advised to agree to removal. And she could have done this from Mexico within the standard 90-day period for a motion to reopen. Although 8 C.F.R. § 1003.2(d) might be thought to suggest that petitioners cannot reopen their removal orders from outside the United States, we have held that the Board cannot divest itself of the jurisdiction created by 8 U.S.C. § 1229a(c)(7)(A) and (C), which allows petitioners the opportunity to file one motion to reopen within 90 days, regardless of the alien's location. See *Rivas-Melendrez v. Napolitano*, 689 F.3d 732, 739 n.5 (7th Cir. 2012); *Marin-Rodriguez v. Holder*, 612 F.3d 591, 594–95 (7th Cir. 2010). (We recognize that Cordova-Soto's prospects for success would have been dimmer in the Eighth Circuit, which has not ruled on this matter, see *Ortega-Marroquin v. Holder*, 640 F.3d 814, 820 (8th Cir. 2011), and that the Tenth Circuit barred out-of-country petitions to reopen until last year, see *Contreras–Bocanegra v. Holder*, 678 F.3d 811, 819 (10th Cir. 2012) (en banc).)

Instead of acting lawfully to seek to reenter, Cordova-Soto reentered the country illegally and did her best to stay out of sight. She did not seek any legal relief from the removal order until five years later, after immigration authorities took her into custody. Her actions fall squarely within the terms of § 1231(a)(5). She is not entitled to reopen that 2005 removal order.

Other circuits have taken different approaches to the question whether an alien may collaterally attack an underlying order of removal during a challenge to the new order of reinstatement. The Second, Tenth (in Cordova-Soto's earlier case), and Eleventh Circuits, like ours in *Torres-Tristan v. Holder*, 656 F.3d 653, 656 (7th Cir. 2011), do not entertain attacks on underlying removal orders during a challenge to new reinstatement orders. See *Cordova-Soto*, 659 F.3d at 1032; *Avila v. U.S. Attorney General*, 560 F.3d 1281, 1285 (11th Cir. 2009); *Garcia-Villeda v. Mukasey*, 531 F.3d 141, 150 (2d Cir. 2008). The Sixth Circuit will review, during a review of the reinstatement order, any constitutional claims or questions of law, including due process challenges to the underlying removal order. *Villegas de la Paz v. Holder*, 640 F.3d 650, 656–57 (6th Cir. 2010) (denying relief on the merits). Three other circuits have said they will consider a collateral attack only to the extent that a petitioner can show a "gross miscarriage of justice" in the underlying proceedings, but we have found no cases actually granting relief under such a theory. See *Zambrano-Reyes*, 725 F.3d at 749, n.3, citing *Garcia de Rincon v. Dep't of Homeland Sec.*, 539 F.3d 1133, 1138 (9th Cir. 2008); see also *Debeato v. U.S. Attorney General*, 505 F.3d 231, 235 (3d Cir. 2007) (denying relief on the merits); *Ramirez-Molina v. Ziglar*, 436 F.3d 508, 513–14 (5th Cir. 2006) (same).

Despite these varying approaches to collateral review of the underlying order while the reinstatement order is under review, we are confident that the statute prohibits collateral review after the review of the reinstatement is complete, as is the case here.

Our conclusion about the effect of § 1231(a)(5) lines up with the principles underlying the fugitive disentitlement doctrine in the law of criminal appeals. That doctrine allows courts to dismiss criminal appeals to prevent fugitives from enjoying the benefits of an appeal while flouting the judgments that keep them in custody. See *Ortega-Rodriguez v. United States*, 507 U.S. 234, 239–42 (1993) (collecting cases); *United States v. Jacob*, 714 F.3d 1032, 1034 (7th Cir. 2013); *Sapoundjiev v. Ashcroft*, 384 F.3d 916, 917 (7th Cir. 2004).

In this case, Cordova-Soto flouted this country's laws by reentering illegally rather than filing a timely motion to reopen. Now, after being caught, she wants the BIA and this court to allow her to attack belatedly her 2005 removal order. The fugitive disentitlement doctrine is discretionary, see *Jacob*, 714 F.3d at 1034; *Gutierrez-Almazan v. Gonzales*, 453 F.3d 956, 957 (7th Cir. 2006), but it is also a judicially created rule. The language of § 1231(a)(5) barring relief here is a mandatory directive in a statute.

We recognize the force of Cordova-Soto's most basic human desire to reunite with her children. We also recognize that Cordova-Soto has spent nearly her entire life in the United States, and we assume for purposes of her petition that she gave up a potential claim for relief from removal by stipulating to removal based on bad legal advice from an immigration officer. And the immigration judge signed off on her 2005 stipulation without addressing whether it was intelligent and voluntary, even though she was not represented by counsel during the proceedings. See 8 C.F.R. § 1003.25(b) ("If the alien is unrepresented, the Immigration Judge must determine that the alien's waiver is voluntary, knowing, and intelligent."). She

therefore had grounds either to appeal her 2005 removal order directly or to file a timely motion to reopen it, after which she might have received cancellation of removal, which might have allowed her to stay in this country legally with her four children and husband, all of whom are U.S. citizens. See 8 U.S.C. § 1229b(a); *In re Taveras*, 25 I&N Dec. 834, 834–35 (BIA 2012) (noting that alien received cancellation of removal despite conviction for possession of crack cocaine); *In re Sotelo-Sotelo*, 23 I&N Dec. 201, 203 (BIA 2001) (explaining that Board uses balancing test to determine if lawful permanent residents deserve favorable exercise of discretion). But she did not appeal, and she did not seek to reopen her proceedings until after she had reentered the United States illegally. Her underlying order therefore "is not subject to being reopened," 8 U.S.C. § 1231(a)(5). Lacking the authority to reopen a removal order after its reinstatement, the Board did not err by denying her motion to reopen.

PETITION DENIED.